Harrigan *v.* The Savannah, Florida and Western Railway Company.

There being sufficient evidence to authorize the court to charge as complained of, and the jury to find a verdict for the plaintiff, and there being no material error in the other grounds for new trial, which would authorize the court to set aside a third verdict for the plaintiff, the judgment granting a third new trial is reversed.
July 12, 1890.

Negligence. Railroads. Verdict. Charge of court New trial. Before Judge Falligant. Chatham superior court. June term, 1889.

Harrigan sued the railway company for damages. His evidence tended to show as follows: He was a carpenter and employed as such by the company about its shops, repairing and building cars, etc. It was customary for carpenters to use the saws of the company in its mill-shop, and to use the particular saw by which he was hurt. He frequently worked on it. On the morning he was hurt he was working on a car, and in the line of his duty had to go and rip some strips at the mill. One Hayden, a tinner, was working on this

car. He told plaintiff he could not work with the hammer he had, gave him the hammer and a piece of hickory, and told him to put a handle in the hammer. Plaintiff was going to the mill to saw the strips and to grind the chisel, and took the piece of hickory with him. He went to the mill and to the saw, brushed off the sawdust and set the saw to work. He went about the work properly; had done such work before, and was working carefully when, by defect in the saw-table, his left hand was thrown against the teeth of the saw and three of the fingers cut off. When he began to saw he thought it was all right; did not inspect the table; thought it was safe; the foreman of the mill is supposed to see that the saws are fit for use; if the saw-table was not fit for use, the belt could have been thrown off in the cellar, and then a man would know there was something the matter with the saw. He did not discover the defect in the table until after his fingers were cut off. The defect was remedied by the company a short while after the injury. There was testimony tending to show that the proper system of inspection of the machinery was not kept up by the company. At the time of the injury plaintiff was earning $2.60 a day, and had been promised that his salary would be raised to $2.75 on the first of the next month. He was laid up by the injury fifteen weeks, and then sought other employment. He got other jobs for short times for less amounts. Because of the injury, he could not do any kind of heavy work which required to be held with his left hand, and could not lift anything heavy; he could not get a job until the outside work was finished and sometimes could not get a job for inside work, because after the outside work was finished the man having it in charge would have as many hands as he wanted; he has not fingers enough to hold the nail to steady it when he is setting a nail; cannot do climbing

on roofs, etc. At the time of the last trial (December, 1888), he was twenty-five years of age. After the injury he applied to one Donovan, boss of the Central Railroad Co., who promised to give him $2.50 a day; and he carried his tools there to go to work, but Donovan came to him and told him that he was unable to do justice to the company, that he had not seen plaintiff's hand before he gave him the job, if he had he would not have given him a job. Since the injury plaintiff has experienced difficulty in getting employment; before he was injured he experienced no difficulty. $2.50 a day are ordinary wages for a carpenter. He had not, at the time he was injured, put his hand over the saw, nor was he cut by the back of the saw. The throat of the table was broken and hung down; and one witness, who had work to do at this saw, had noticed the defect before plaintiff was injured. It had existed for a number of days before he was hurt. "To make hammer-handles" was understood and used by him to apply to putting in or fitting handles already made, as well as to sawing them from blocks of wood. He was not certain that the foreman (LaRoche) told him to make hammer-handles, though he did tell him to put them in or fit them, but plaintiff would "prove that he kept a piece of hickory under the bench for that purpose," not for his own use but for that of all the men. Plaintiff understood that the hammers used by the tinners had to be made for them by the company, and had seen hundreds of them made by the shop-carpenters; "the men brought sledge-hammer handles from the storehouse to be reduced to make hammer-handles out of them." He had reduced hundreds of hammer-handles; had made them with a piece of wood, but not on a rip-saw, though this was not his first trial to saw one in that way. LaRoche on different occasions had told him to put in a hammer-handle for men who

wanted it done, and had said, "Don't ask me for permission to do such little jobs; put it in." He had given instructions like this to other men, and he told plaintiff that at any time a man came and wanted to have a handle reduced, to reduce it. When on one occasion plaintiff went to him and told him a man wanted him to "put in" a handle, and he (LaRoche) told him "All right; go ahead," LaRoche did not know whether the man had the handle or whether the plaintiff would have to cut it. Glass, who succeeded LaRoche, "was working there at the time LaRoche was foreman, was a carpenter like myself, having the same regulations down there as I have; he did not give me instructions different from those I received from LaRoche; he never gave me orders as to doing jobs—nothing different, not any different instructions at any time as regards hammer-handles."

A fellow-carpenter testified for the plaintiff: Does not know whether he made hammer-handles for fellow-workmen; did for himself. Thinks he did for some one; thinks LaRoche, the foreman, gave him some small handles to make. Would not do work of this kind without instructions from boss. " That is the rule and understanding—the common understanding. I never knew of any custom by which carpenters there made hammer-handles for another. To fit hammer-handles is a different thing. I could not say that it was customary to make hammer-handles for other people; that of course is left to the man ; if he did it, it was all right, and if he wouldn't it was all right."

Another fellow-carpenter testified for plaintiff: Reduced sledge-handles to hammer-handles, on instructions; would put hammer-handles in hammer with consent of boss; if he could not find boss to tell him, would do the work and tell him afterwards. Q. "Did Mr. Glass, the foreman after Mr. LaRoche, give

orders to make handles?"  A.  "Blacksmiths bring
handles to Mr. Glass, and tell me to put the handles in
for them; I never made handles except for myself.  I
have frequently made handles for blacksmiths; I have
seen other carpenters do the same thing.  Was appren-
tice when plaintiff got hurt."  Q.  "You made a handle,
or fit a handle in?"  A.  "Fitted handles in."  Does
not know of handles being made there, nor whether or
not it was against rules of the company to make ham-
mer-handles there, nor of any custom to make handles
for other men.  "Mr. Glass told me about putting in
handles, not to make handles except for myself, with-
out orders."  Q.  "He generally gave you orders to
make handles out of a piece of wood?"  A. "No.  All
handles I put in were furnished, unless I made them
for myself."

Hayden testified: "Carpenters have always been fix-
ing handles.  Brady, foreman of tinners, did not in-
struct me not to apply to carpenters for hammer-
handles.  A person by the name of Joe Brown made
hammer-handles down there in the same year."

LaRoche (ex-foreman) testified for plaintiff: There
was no established rule in reference to workmen mak-
ing hammer-handles—merely an understanding that
the workman should go to the foreman, if the latter
was there, and if not, "in preference to waiting he
could make a handle to facilitate work."  It was to the
interest of the company, and "a man would do little
jobs provided it was to advance the interest of the com-
pany."  It was not a matter of duty for a carpenter to
make one when asked by a tinner to do so, but it was
often done, and no objection was made.  And when
they came to witness and said they were going to put
in a handle for so and so, he would make no objection.
While foreman he had made hammer-handles, and kept
a piece of hickory for that purpose.  Could not say posi-

tively whether he had seen men putting in handles without orders or not.  " I guess Mr. Harrigan is right when he says that the first time he made a hammer-handle he came to me or I came to him and told him to do it, and the second time I told him he could go along and make such a thing without special orders from me or to come to me for permission.  I never objected for a man to make a handle for the company's work unless I had selected the man to do certain work. I have heard Mr. Harrigan's testimony on that point, and I believe I did give him the orders he says I gave him.  I have a recollection of telling Mr. Harrigan to make hammer-handles.  I directed him on special occasions to do so."  Q. " You did not give him general orders to make hammer-handles?"  A. " No, sir.  I think one time I was extra busy and he came to me about making a hammer-handle for some one, and I told him to go ahead and do such a thing without coming to me for orders."  Q. " Only in that case ?"  A. " Yes, sir."

The evidence for the defendant tended to show that Hayden did not need to do the work on which he was engaged when he requested plaintiff to make the hammer-handel; that handles other than such as were kept in stock by the defendant were furnished to its tinners, on application to the foreman of the tinners, which application it was the duty of the tinner to make; that it was not the duty of plaintiff to make the handle for Hayden, but out of the line of his duty ; that he was injured because he did not use sufficient caution in using the saw and in examining its condition ; that the person whose duty it was to make inspection of the machinery in the mill had not been informed of the defective condition of this saw-table ; that the saw plaintiff was using was not intended for carpenters, but that there was a saw in the mill intended for car-

penters, which plaintiff had passed directly by to reach the saw at which he was injured, but carpenters could use the saw on which plaintiff was hurt; and the person having supervision of the mill had been once asked to allow orders to be put up prohibiting carpenters using the saw and had refused. One witness worked at the saw in question on the day before plaintiff got hurt, and if it had been dangerous, would have noticed it; did not notice the depression; the only way in which plaintiff got his hand cut was by putting his hand back behind the saw, and witness in sawing would not use the saw that way; it depends on the man who was doing the work as to whether it was dangerous to work on a table which had a defective throat as this table had. Witness considered every saw dangerous for a shop-carpenter to work on. On Saturday afternoon before work is over, there is a general cleaning up, the floors are swept and the machineries are cleaned with waste and oiled. The foreman makes a close inspection of the saws every Sunday, and if any defects are found they are repaired immediately; this is the usual custom as to inspection in that mill. It is not customary to have any more inspection than that. The defect in the saw could not have existed very long, or some one would have reported it. Whenever men report that machines are out of order, the foreman sees what the trouble is and has it repaired immediately. One witness testified that it was not unusual for carpenters to reach over to the back of the saw to hold down the piece they were sawing, and that there was nothing in what plaintiff did that was unusual, except to get cut, and he was cut by the lack of caution, because if he had been cautious he would have seen the condition of the table, and he would not have undertaken to saw a piece on it such as he did undertake to saw.

The foreman of the tin-shop testified for defendant:

Q. " In last September, if any one of the men under you in your department wanted a hammer-handle, what was his duty ?"    A. " Well, it had been that he would go and get it made under Mr. LaRoche; they went there so often that Mr. LaRoche complained to me about it and said, ' Your tinners are bothering me about hammer-handles.' I said, ' Don't make them, and let them come to me as they want them, and I will get them for them.' I don't think anybody else made them. I went right off to Mr. Bennett and asked him to order out some hammer-handles. I had a handle made in the carpenter-shop and put in. I did not have to get orders to make one; I only went to Mr. LaRoche when I wanted one to put in handles. I did not give Mr. Hayden authority to go to Mr. Harrigan or anybody else to have this hammer-handle made."

Glass (foreman of car-shop and immediate superior of plaintiff when hurt) testified for defendant : Did not know of custom to make hammer-handles, and did not give permission to do so to Harrigan ; he had no right to leave his work and do so. Making a handle and putting in a handle are two different things. Witness worked there as a carpenter before he was made foreman, and had made hammer-handles ; does not remember having made without orders, but if he did so, he reported to foreman afterwards ; had made handles for his own use and for other men working with the road there—very seldom. Did not remember making without orders. Had seen the carpenters make hammer-handles ; during LaRoche's time, there had been men in the habit of putting in hammer-handles while working on other jobs ; does not know that it was a custom for carpenters, without orders, to put in hammer-handles for the tinners in LaRoche's time, but had seen it done time and again, and knew nothing of objection being made. Not in witness's time, but in LaRoche's.

In LaRoche's time it was frequent for one workman to do little favors for another at work on the same job with him. " They have handles also in the store-room, but I have been in the habit of putting them in at the shops." Making a handle and putting in a handle are two different things. Was expecting Harrigan to finish up with the car, and he had no right to leave it to make hammer-handles without orders. I don't know any rule exactly about that. Q. "Have the company got any rules and regulations that are given out to the men to show them how to act in these matters?" A. No rule posted up. Must get permission from foreman. Witness knew this to be the case before he got to be foreman. Does not know where the rules come from; "they are there since I have had charge," written; could not say these rules were there at the time Harrigan got hurt. " I don't remember the day the rules were put there; it was the general rule—has always been—when a man wants work done in another department, they have to go to the foreman." The company never sent orders to that effect that witness knows of; none of the heads gave orders to that effect. Q. "There were no rules emanating from the heads of the road, from the superintendent or officers, preventing anything of the kind?" A. "No, but one man comes along and goes to another employé to do some work for him; it would prevent the man from doing his work."

Defendant's foreman of car department testified that it was not a part of carpenter's duty to make hammer-handle. System of keeping hammer-handles was in vogue several years before plaintiff was hurt, and he had no right without orders from foreman to put in or make handle. When a man is employed, it is the understanding and custom that he is expected to do the work for which he is employed; the foreman assigns

v 84-51

the work, he is the representative of the road as far as he is concerned; whatever the foreman tells him to do it is his duty to do, and he is not to do anything else. When LaRoche was in charge down there, "he knew that I kept material of that kind on hand for hammer-handles. He served his time down there as an apprentice. It was always a custom for shop-carpenters to go and use the saws in the mill. I refused Mr. Hill's request to issue orders prohibiting carpenters from using the band-saw. The carpenters do not work in the mill now; that change was made on account of Mr. Harrigan's injury; it was made a long time after he was injured, on account of so many coming in there to do private jobs and from the fact that they got injured."

On the third trial, the jury found for the plaintiff $3,300. The grounds for new trial, to the grant of which exception was taken, were as follows:

(1) Verdict contrary to law and evidence, and excessive.

(2) After charging, as requested by the defendant, that "if as a matter of fact it was not Harrigan's duty to make a hammer-handle for Hayden, Harrigan's belief that it was his duty, if such was his belief, would not justify him in making a hammer-handle for Hayden," the court added the following: "I charge in addition to and connection with this proposition: if you find, however, that this plaintiff's foreman directed him at one time to make hammer-handles for employés when they required them, without going to him specially for orders, and that this direction was never countermanded, then this plaintiff had the right to act upon that direction. If you find that it was at one time customary for employés to make hammer-handles for other employés, that there was no rule to the contrary, but that afterwards a rule was made prohibiting the practice, and that this plaintiff had no notice of the rule, then

of course such a rule would not affect him." Error, because not warranted by the evidence.

(3) The court charged: "If you find that Hayden was a tinner employed by the company, and that he needed a hammer-handle for use in the company's business, and if you find that this plaintiff was injured while making a hammer-handle for Hayden, to be used in the company's business, and that in doing this he was not acting contrary to orders, but that it was in the line of his duty, then the fact that he was so engaged making a hammer-handle would not be a bar to his recovery." Error, because not warranted by evidence.

(4) Error in admitting, over objection that it was hearsay, the testimony of plaintiff that he and Hayden were working together on the car, and Hayden said that the hammer the company furnished him was a short hammer and that the tin bracket he had to rivet on the hip of the car could not be worked well without a longer hammer.

(5) Error in admitting, over objection that it was hearsay, the testimony of plaintiff that Donovan, an employé of the Central Railroad Company had told plaintiff that he was not able to do justice to the Central railroad; that Donovan had not seen plaintiff's hand before he gave him the job, and if he had he would not have given plaintiff the job.

R. R. RICHARDS, for plaintiff.

CHISHOLM & ERWIN, for defendant.

SIMMONS, Justice.

This case has been tried three times before a jury, and upon each trial a verdict was returned in favor of the plaintiff. The presiding judge granted a new trial from the first verdict, and upon the second verdict, refused to grant a new trial, and the case was brought here by bill of exceptions, and this court granted a new

trial. 80 *Ga.* 602. After the third verdict, the judge who presided resigned, and another judge was appointed in his place, and the latter granted a third new trial. The plaintiff excepted and brought the case here.

The main question argued here was whether there was sufficient evidence to support the verdict, and it was agreed by counsel for the plaintiff and defendant that if, upon a review of the whole case, this court should think that the evidence was sufficient to authorize a verdict before any jury, the judgment should be reversed and the litigation ended. We have read the evidence sent up in the record several times, and had an abstract of it made upon the leading facts in the case, and after a careful review of the evidence and of this abstract, we think there was sufficient evidence to authorize the court to charge as complained of in the several grounds of the motion, and sufficient evidence to authorize a jury to find for the plaintiff.

There is no material error of law in the other grounds of the motion which would authorize the court to set aside a third verdict; and believing that there is sufficient evidence to authorize the finding of the jury, we will put an end to this long litigation by reversing the judgment of the trial judge granting a third new trial.        *Judgment reversed.*